## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**OMAR N. BEYAH,**                                      )
)
**Plaintiff,**                                 )
)
**v.**                                              )          **Civil Action No. 07-109 (ESH)**
)
**GENE L. DODARO,**                                    )
**Acting Comptroller General,**                        )
**U.S. Government Accountability Office,**              )
)
**Defendant.**                                 )
_____)

## <u>MEMORANDUM OPINION</u>

Plaintiff Omar N. Beyah is an African-American male who was previously employed by

the United States General Accounting Office ("GAO" or "the agency").  He claims that his

employer discriminated against him on the basis of his race and gender and retaliated against him

for opposing that discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.* ("Title VII").  Having considered defendant's motion for summary

judgment, the record herein, and for the reasons set forth below, the Court will grant the motion.

## BACKGROUND

Since approximately 1988, plaintiff worked for the U.S. General Services Administration

as an architect and a program manager.  (*See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Opp'n"),

Decl. of Omar N. Beyah ("Beyah Decl.") ¶ 2.)  In April 2003, while attending a Senior Executive

Fellows program at Harvard University, plaintiff met Mark Goldstein, a director in GAO's

Physical Infrastructure ("PI") team.  (*See* Opp'n, Statement of Genuine Issues and Affirmative

Statement of Material Facts ("Pl.'s SMF") at 1-2 ¶ 3.)  Goldstein actively recruited plaintiff to

apply for a position with GAO, and in June, Goldstein met with plaintiff to discuss an

employment opportunity as a GAO analyst working on PI issues.  (*See id.* at 2 ¶¶ 4-5.)  Goldstein

informed plaintiff about the GAO website's description of the position, gave him the website

address for the online application, and encouraged him to apply.  (*Id.* at 2 ¶ 6; Opp'n,

Attachment 29 (Beyah Dep., Apr. 11, 2008) ("Beyah Dep."[1]) at 49:11-14).  Thereafter, plaintiff

applied for the position, which was at the "Band II" level.  (Pl.'s SMF at 2 ¶ 7.)  GAO classifies

employees in one of three "bands" (Bands I, II, and III) instead of using the General Schedule

("GS") pay system; during the relevant period, the pay range for employees at the Band II level

was approximately equivalent to the salary range covered by the GS-13 and GS-14 grades.

(Def.'s Mot. for Summ. J. ("Mot."), Ex. 3 (Decl. of Margaret Braley) ("Braley Decl.") ¶ 2.)

Around July 2003, plaintiff interviewed with Goldstein and Terrell Dorn, then an

assistant director in PI, among other GAO officials.  (Pl.'s SMF at 2 ¶ 8.)  After interviewing

plaintiff and other applicants, Goldstein and Dorn decided that plaintiff was the best candidate

for the Band II "senior analyst" position.  (Def.'s SMF ¶ 9.)[2]  Consequently, Goldstein and Dorn

recommended to Mike Gryszkowiec, PI's managing director, that plaintiff be hired, and plaintiff

thereafter accepted an offer to join GAO as a Band II Senior Analyst.  (Pl.'s SMF at 2-3 ¶¶ 9-

10.)  Consistent with GAO regulations at the time, plaintiff was informed on July 23 that he

---

[1] Defendant also submitted excerpts from this deposition as Exhibit 5 to his motion.

[2] Plaintiff denies that the position was a Band II position (*see* Pl.'s SMF at 2 ¶ 9), but this denial does not comply with Local Civil Rule 7 because it is not supported with a citation to record evidence.  *See* Local Civ. R. 7(h) ("An opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, *which shall include references to the parts of the record relied on to support the statement.*" (emphasis added)).  As such, plaintiff has not raised any genuine issue with respect to this factual assertion by defendant.  *See Adesalu v. Copps*, 606 F. Supp. 2d 97, 103 & n.4 (D.D.C. 2009) (Friedman, J.) (declining, in Title VII case, to recognize plaintiff's denial of defendant's asserted material fact where he failed to comply with Rule 7(h)(1)'s requirement that denials must be supported by citation to record evidence).

would be serving a one-year probationary period.  (*See id.* at 3 ¶¶ 11-12.)

Plaintiff's effective start date at GAO was September 21, 2003.  (Opp'n, Ex. 1 (Notification of Personnel Action) at 1.)  Dorn served both as plaintiff's supervisor and his Designated Performance Manager ("DPM"), and thus was responsible for monitoring and assessing plaintiff's performance.  (Pl.'s SMF at 4 ¶ 18.)  Dorn reported to Goldstein, who in turn reported to Gryszkowiec.  (*Id.* at 4 ¶ 19.)  After plaintiff had completed orientation and initial training, Dorn and Goldstein assigned Maria Edelstein, a Band II Senior Analyst on the PI team who had been with GAO for approximately 15 years, to be plaintiff's day-to-day supervisor.  (*See* Def.'s SMF ¶ 17; *see also* Pl.'s SMF at 3-4 ¶ 17.)[3]  Plaintiff was told to report directly to Edelstein, with whom he worked on "most of" his projects.  (Beyah Dep. 115:11-13, 115:23-116:16.)

Plaintiff's first assignment was an internal PI engagement for which he was tasked with developing a GAO guidance document regarding the design process ("the Guide").  (*See* Pl.'s SMF at 4-5 ¶ 22; Beyah Dep. at 105; Mot., Ex. 18 (Pl.'s Resps. To Def.'s 1st Interrogs.) at 41.)  On this engagement, Edelstein was the analyst-in-charge and Dorn was the assistant director.  (Mot., Ex. 18 at 41.)  From October 2003 to February 2004, plaintiff prepared multiple drafts of sections of the Guide.  (Pl.'s SMF at 5 ¶ 24.)  Although the Guide initially focused on the design

---

[3] Although plaintiff denies that Edelstein was his supervisor and cites to his 2009 declaration as support (*see* Pl.'s SMF at 3-4 ¶ 17), this denial is expressly contradicted by his 2008 deposition testimony, which was cited in defendant's statement of facts.  (*See* Beyah Dep. at 115:4-6 (Q: "[W]ould you say that Ms. Edelstein had been your supervisor since day one, since when you started?" A: "Yes.").)  "Plaintiff cannot contradict clear answers to unambiguous questions given at deposition for the purpose of creating disputed factual issues and thereby avoid summary judgment."  *See Hendricks v. Paulson*, 520 F. Supp. 2d 65, 79 n.17 (D.D.C. 2007), *aff'd sub nom. Hendricks v. Geithner*, 568 F.3d 1008 (D.C. Cir. 2009); *see also Reetz v. Jackson*, 176 F.R.D. 412, 414 (D.D.C. 1997) ("'[A] party's affidavit which contradicts [her] own prior deposition testimony should be disregarded on a motion for summary judgment.'" (quoting *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987)).

phase, by January 2004 the focus had shifted to conceptual planning.  (Beyah Dep. at 105:3-6.)

Plaintiff received negative comments on his sentence structure and use of industry terms and

references, and he was specifically criticized for not connecting the design phase to the

construction process.  (Pl.'s SMF at 5 ¶ 24.)  After the Guide was finalized, plaintiff was also

tasked with "indexing" its contents, a process by which GAO verifies and documents that all

information contained in a GAO product is supported by source material.  (*Id.* at 5 ¶ 25.)

Following his first indexing attempt, plaintiff received comments from the index reviewer that

the index was not consistent with GAO's indexing rules.  (Mot., Ex. 21 (Pl.'s Resps. To Def.'s

2nd Interrogs.) at 4.)  Edelstein subsequently criticized plaintiff's work and required him to re-

index the entire document.  (*Id.* at 4-5.)

In February 2004, plaintiff was assigned to work on an engagement involving PI issues at

the John F. Kennedy Center for the Performing Arts ("Kennedy Center").  (Pl.'s SMF at 5-6 ¶

27.)  Plaintiff's principal role was to develop an estimate of operations and management

("O&M") costs and draft a section for the report on this issue.  (*Id.* at 6 ¶ 28.)  Edelstein was the

project's analyst-in-charge.  (Beyah Dep. at 117:9-15.)  In March, Susan Fleming joined the

project as the assistant director; she served as plaintiff's second-level supervisor, setting

objectives and deadlines, and reported to the project's director, who was Goldstein until Peter

Guerrero took over in April.  (*See* Beyah Dep. at 143-45; Mot., Ex. 19 (Fleming EEO Aff., May

16, 2005) ("Fleming Aff.") ¶¶ 2-3, 6.)  That same month, plaintiff was involved in a dispute with

a GAO librarian.  (*See* Def.'s SMF ¶ 47.)[4]  At another point during plaintiff's time with GAO, a

U.S. State Department official called and complained to John Brummet, an assistant director on

---

[4] Plaintiff appears to deny the fact of an argument (*see* Pl.'s SMF at 9 ¶ 47), but his
declaration confirms that he had an interaction with the librarian where she supposedly was
"rude," "hostile," and "disrespectful," and which involved a "miscommunication" for which she
faulted plaintiff.  (Beyah Decl. ¶ 50.)

GAO's International Affairs and Trade ("IAT") team, about plaintiff's confrontational conduct while attending a meeting with IAT and State Department officials. (*Id.* at 9 ¶ 46; *see also* Opp'n, Ex. 8 (Brummet EEO Aff., May 10, 2005) ("Brummet Aff.") ¶ 3.)

On April 7, 2004, Fleming and Edelstein met with plaintiff to discuss the expectations for his performance on the Kennedy Center engagement. (*See* Pl.'s SMF at 11 ¶ 56.) During the meeting, when Fleming learned that plaintiff was working on seven projects, she "cautioned [him] about working on too many jobs," and they discussed that he had to "be careful to manage them to meet job expectations for the Kennedy Center." (Mot., Ex. 53 (Apr. 7, 2004 Beyah mem.) at 1-2.) Following the meeting, plaintiff gave Fleming a memorandum containing his minutes of that meeting. (*See id.*; Pl.'s SMF at 11 ¶ 56.) At plaintiff's request, he and Fleming met again that same day to discuss why expectations were being set for his work. (Pl.'s SMF at 11 ¶ 56.) On April 16, plaintiff emailed Fleming a memorandum of minutes from that second April 7 meeting. (*Id.* at 12 ¶ 57; *see* Mot., Ex. 54 (Apr. 16, 2004 Beyah mem. & cover letter).) The email explained that plaintiff intended to put in writing "matters that could impact personnel actions with or against" him, specifically disagreements involving "observation[s] of behavior" that would "impact[] [his] decision making" or his "ability to do work in a supporting environment." (Mot., Ex. 54 at 1.)

That same month, plaintiff met with Kennedy Center officials on at least two occasions. (*See* Mot., Ex. 17 (Edelstein EEO Aff., May 12, 2005) ("Edelstein Aff.") ¶ 5.) During one meeting, plaintiff asked an official whether the Center might be "wasting money in those instances when it does not know what it is spending money on." (Beyah Decl. ¶ 55.) Fleming concluded that the officials were offended because plaintiff inappropriately "informed them that they were not following industry standards and best practices and most likely wasting money."

(Fleming Aff. ¶ 6.)  Edelstein similarly felt that plaintiff made inappropriate recommendations and requests that upset the officials.  (*See* Edelstein Aff. ¶ 5.)  Fleming and Edelstein told Dorn and Goldstein about these concerns and what they perceived to be plaintiff's defensiveness when receiving feedback and his inability "to complete basic paperwork without supervision."  (Mot., Ex. 27 ("Dorn DPM Notes") at 1; *see also* Fleming Aff. ¶ 6; Edelstein Aff. ¶ 5.)

On June 9, 2004, Edelstein circulated to the Kennedy Center PI team a timetable for completing their work on the report, including a June 18, 2004 deadline for first drafts of each section. (Pl.'s SMF at 6 ¶ 31.)  On Friday afternoon of June 18, plaintiff emailed Edelstein and Fleming what he described to be "[a] working draft of sec. 3," which was a three-page outline. (*See id.* at 6 ¶¶ 32-33; Mot., Ex. 30 (June 18, 2004 draft) at 2-4.)  On June 22, plaintiff submitted to Edelstein his first revised draft section, which did not contain any O&M cost estimates for the proposed Kennedy Center buildings.  (Pl.'s SMF at 7 ¶ 34; *see* Mot., Ex. 33 (June 22, 2004 draft) at 14 (estimating O&M costs "to be approximately $X million in 2012").)  When reviewing this first revised draft, Edelstein commented that plaintiff needed to better explain and "set up" his substantive discussions.  (Pl.'s SMF at 7 ¶ 35.)  In a June 30 meeting with Dorn and Edelstein, plaintiff gave an oral presentation of his section of the report, after which Dorn concluded that plaintiff's work was "unacceptable and could not be supported" because he lacked "backup for his work," used "flawed" methodology, and could not "explain what is behind the numbers he [was] using."  (Dorn DPM Notes at 1; *see also* Pl.'s SMF at 7-8 ¶¶ 36-38.)

On July 1, 2004, plaintiff gave Edelstein another draft of his section of the report, which he titled his "second revised draft."  (Pl.'s SMF at 8 ¶ 39.)  This draft did include an O&M cost estimate.  (*See* Mot., Ex. 35 (July 1, 2004 draft) at 2 (estimating $4-5 million in O&M costs).) Edelstein provided substantive comments on this draft. (Pl.'s SMF at 8 ¶ 40.)  Dorn also

requested that plaintiff adjust his O&M calculations to reflect the higher costs associated with the Washington, D.C. area.  (*Id.* at 8 ¶ 41; *see* Beyah Decl. ¶¶ 37-39; Opp'n at 13-14.)  On July 5, plaintiff submitted another draft that contained the locality-adjusted O&M numbers.  (Pl.'s SMF at 8 ¶ 41; *see* Mot., Ex. 37 (July 5, 2004 draft) at 1 (estimating $6-8 million in O&M costs).)  In his cover email for this third revised draft, plaintiff stated: "I am optimistic that out of the many tries to nail down the potential costs in current dollars I think we might have something worth your review and consideration."  (Pl.'s SMF at 8 ¶ 41.)  Dorn and Fleming then made substantive comments on the July 5 draft.  (*Id.* at 8 ¶ 42.)  Thereafter, Fleming asked Ron Stouffer, an experienced PI employee who was not part of the Kennedy Center engagement team, to meet with plaintiff to try to assist him in writing his portion of the report. (*See id.* at 8-9 ¶ 43; *see also* Beyah Decl. ¶ 45.)  On July 7, Dorn met again with plaintiff and discussed plaintiff's work on the Kennedy Center report.  (*See* Pl.'s SMF at 9 ¶ 44.)

On July 15, 2004, Gryszkowiec conducted a meeting with Dorn, Fleming, Edelstein, Guerrero, and Goldstein, to discuss what they perceived to be plaintiff's performance and interpersonal problems.  (Def.'s SMF ¶ 49; *see also* Mot., Ex. 44 ("Gryszkowiec Meeting Notes") at 2.)[5]  As PI's managing director, Gryszkowiec was ultimately responsible for deciding whether to recommend the termination of PI employees to GAO's Human Capital Office.  (Pl.'s SMF at 9-10 ¶ 48.)  GAO regulations at the time stated that a probationary employee should be separated from GAO "whenever the employee's work performance or conduct fails to demonstrate the fitness or qualifications for continued GAO employment."  (*Id.* at 11 ¶ 54.)  At

---

[5] Plaintiff denies that his interpersonal problems were discussed at the meeting (*see* Pl.'s SMF at 10 ¶ 49), but the denial is not supported by his citation to the portion of Gryszkowiec's deposition wherein Gryszkowiec states he does not recall whether plaintiff's interpersonal issues were specifically raised.  (*See* Mot., Ex. 43 (Gryszkowiec Dep., Sept. 30, 2008) ("Gryszkowiec Dep.") at 43:11-44:23.)  *See supra* note 2; Local Civ. R. 7(h).  Further, Gryszkowiec's notes from that meeting explicitly reference interpersonal issues.

the July 15 meeting, Goldstein, Dorn, Fleming, and Edelstein expressed concerns about plaintiff's performance, with Goldstein and Dorn recommending that plaintiff's employment be terminated.  (*See id.* at 10 ¶¶ 50-51; Gryszkowiec Dep. at 35-36.)  Based on the information received during the meeting and the applicable GAO regulations, Gryszkowiec decided that plaintiff should be terminated for poor performance and problematic interpersonal skills.  (*See* Pl.'s SMF at 10 ¶ 52.)

As a result of Gryszkowiec's decision, on July 15, 2004, Goldstein informed plaintiff that his employment would not be extended beyond his probationary period.  (Pl.'s SMF at 10-11 ¶ 53.)  The next day, plaintiff contacted an Equal Employment Opportunity ("EEO") counselor in GAO's Office of Opportunity and Inclusiveness.  (*See id.* at 12 ¶ 59.)  This was his first contact with an EEO representative at GAO.  (*Id.*)  In early August, plaintiff filed a charge with GAO's Personnel Appeals Board ("PAB"), challenging the actions leading up to and including his termination.  (*See* Opp'n, Ex. 25 ("PAB Documents") at 1.)  On August 20, Gryszkowiec sent a memorandum to GAO's Chief Human Capital Officer, Jesse Hoskins, recommending the termination of plaintiff's appointment during his probationary period for unsatisfactory performance and interactions, stating that plaintiff had "continued difficulties" in the GAO performance competencies of "Achieving Results," "Presenting Information Orally," "Presenting Information in Writing," "Representing GAO," and "Collaborating with Others."  (Pl.'s SMF at 11 ¶ 55.)[6]  On August 23, Hoskins issued a letter to plaintiff notifying him that he would be terminated effective September 10, 2004, for unsatisfactory performance.  (*See* Opp'n, Ex. 7 ("Hoskins Letter").)  On September 9, the PAB granted two *ex parte* requests by its General

---

[6] The performance competencies describe the level of performance necessary to "Meet Expectations" in each competency at each band level, which is the minimum level of acceptable performance in GAO's Competency-Based Performance System.  (Pl.'s SMF at 1 ¶ 2.)

Counsel to stay plaintiff's termination date, so that the General Counsel could investigate whether plaintiff's terminations arose from "one or more prohibited personnel practices." (PAB Order at 13 n.1.) Plaintiff's termination was stayed until the end of business on October 18, 2004. (*Id.* at 17.) He subsequently exhausted his administrative remedies and timely initiated this action on January 17, 2007.

## ANALYSIS

## I.    LEGAL STANDARDS

### A.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A dispute about a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Haynes v. Williams*, 392 F.3d 478, 481 (D.C. Cir. 2004) (quoting *Anderson*, 477 U.S. at 248). A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Wash. Post. Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits or other competent

evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ.

P. 56(e); *Celotex*, 477 U.S. at 324.  If the non-movant fails to point to "affirmative evidence"

showing a genuine issue for trial, *Anderson*, 477 U.S. at 257, or "[i]f the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50

(internal citations omitted).  "While summary judgment must be approached with special caution

in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by

affidavits or other competent evidence showing that there is a genuine issue for trial."  *Calhoun*

*v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998), *aff'd* No. 99-5126,

1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 1999) (internal citation omitted).

> **B.      Title VII**

Under Title VII of the Civil Rights Act of 1964, it is an "unlawful employment practice"

for employers "to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex,

or national origin."  42 U.S.C. § 2000e-2(a)(1).  It is also unlawful to retaliate against an

employee because he "has opposed any practice made an unlawful employment practice" by

Title VII or because she "has made a charge, testified, assisted, or participated in any manner in

an investigation, proceeding, or hearing" under Title VII.  *Id.* § 2000e-3(a).  Traditionally, courts

have examined Title VII claims for discrimination under the three-step burden-shifting

framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  However,

where an employer has asserted legitimate, non-discriminatory reasons for the actions being

challenged by the plaintiff,

> the district court must resolve one central question: Has the employee produced
> sufficient evidence for a reasonable jury to find that the employer's asserted non-

> discriminatory reason was not the actual reason and that the employer
> intentionally discriminated against the employee on the basis of race, color,
> religion, sex, or national origin?

*Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  "[T]hese principles

apply equally to retaliation claims . . . ."  *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).

A plaintiff has the burden of persuasion to show that a defendant's proffered non-

discriminatory reason for the challenged action is a pretext.  *Morgan v. Fed. Home Loan*

*Mortgage Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003).  A plaintiff can carry this burden by

showing that a non-discriminatory reason offered by a defendant is false, *Montgomery v. Chao*,

546 F.3d 703, 707 (D.C. Cir. 2008), or otherwise "presenting enough evidence to allow a

reasonable trier of fact to conclude that the employer's proffered explanation is unworthy of

credence."  *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (internal quotation marks

omitted).  A plaintiff may also "attempt[] to produce evidence suggesting that the employer

treated other employees . . . more favorably in the same factual circumstances" than the

employer treated the plaintiff.  *Brady*, 520 F.3d at 495.  Where "the employer's stated belief

about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no

basis for permitting a jury to conclude that the employer is lying about the underlying facts," and

summary judgment is appropriate.  *Id.*; *see also Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d

23, 27-28 (D.C. Cir. 1997) ("[I]f [a plaintiff] is unable to adduce evidence that could allow a

reasonable trier of fact to conclude that [the defendant's] proffered reason was a pretext for

discrimination, summary judgment must be entered against [the plaintiff].")

## II.   DISCRIMINATION

Title VII "establishes two elements for an employment discrimination case: (i) the

plaintiff suffered an adverse employment action (ii) because of the employee's race, color,

religion, sex, or national origin."  *Brady*, 520 F.3d at 493.  "A plaintiff must prove both elements

to sustain a discrimination claim."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir.

2008).

Plaintiff alleges that defendant discriminated against him on the basis of his race by not

hiring him at the Band III level,[7] and that defendant terminated him from his Band II senior

analyst position because of his race and/or gender.  Defendant contends that there were

legitimate, non-discriminatory reasons for not selecting plaintiff for a Band III position and for

later terminating him from his Band II position.  (Mem. of P. &. A. in Supp. of Def.'s Mot. for

Summ. J. ("Mem.") at 2.)  The Court finds that plaintiff has failed to "produce sufficient

evidence that his employer's asserted legitimate non-discriminatory reason[s] . . . [were] not the

actual reason[s] and that [plaintiff] suffered discrimination on an impermissible ground."

*Baloch*, 55 F.3d at 1197.  Accordingly, summary judgment shall be granted with respect to

plaintiff's discrimination claims.

### A.     Count IV: Non-Selection

Plaintiff alleges that defendant discriminated against him on the basis of his race by

hiring him as a Band II analyst, because this position was at a band or salary "lower than those

levels at which [the agency] appointed similarly situated, Caucasian members of the Physical

Infrastructure Team who held positions comparable to plaintiff's[.]"   (Compl. ¶ 67.)  As

evidence of discrimination, he points to the fact that a Caucasian applicant, Bradley James,

joined the agency at the Band III level in a temporary three-year Comptroller General

appointment dedicated to construction issues related to the U.S. Capitol Visitor's Center.  (Opp'n

at 5; *see* Opp'n, Ex. 11 (Decl. of Bradley James) ("James Decl.") ¶¶ 1-2.)  Even if the supposed

failure to consider plaintiff for the position on the Visitor's Center project constituted an adverse

---

[7] The pay range for the Band III level was approximately equivalent to the salary range
covered by the GS-15 grade.  (Braley Decl. ¶ 2.)

action,[8] defendant has proffered the legitimate, non-discriminatory reason that James was the more qualified applicant, and based on the undisputed evidence, the Court concludes that plaintiff has failed to create a reasonable inference that this was not the true reason for his supposed non-selection.

"[A]n 'employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria.'" *Porter v. Fulgham*, 601 F. Supp. 2d 205, 219 (D.D.C. 2009) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)). Here, the undisputed facts show that the plaintiff did not even meet the standard of being "equally qualified." Plaintiff had approximately 14 years of experience as an architect and held no professional license, while James was a licensed professional engineer with over 29 years of experience as a civil engineer for the Army Corps of Engineers. (Pl.'s SMF at 3 ¶¶ 14-15.) Thus, even assuming that plaintiff was qualified to fill the Visitor's Center position,[9] the fact that James was *more* experienced than plaintiff undercuts any possible inference of discrimination.

---

[8] The Court need not resolve defendant's alternative contention that plaintiff cannot establish the necessary element of an adverse action because he did not apply for a Band III position. (Mem. at 34.) However, plaintiff has admitted that he "never applied" for James's position. (Pl.'s SMF at 3 ¶ 13.) Further, Dorn had no authority to hire anyone for a permanent Band III position (Mot., Ex. 15 (Decl. of Terrell Dorn) ("Dorn Decl.") ¶ 10), and there is no indication that plaintiff – who had been recruited for permanent employment – expressed an interest in a *temporary* position during his recruitment or subsequent interviews. (*See* Beyah Dep. at 64; Beyah Decl. ¶¶ 9-11.)

[9] Plaintiff has not established that he was qualified to fill the position on the Visitor's Center project. He argues that James "engaged in the type of work that [plaintiff] was qualified to perform" (Opp'n at 8), but his sole support for this claim is his observation that James did "[a] lot of the kinds of work that [plaintiff] did for construction projects at GSA . . . ." (Beyah Dep. at 76:19-77:11.) Because plaintiff denied ever seeing the description of James's position or ever working on the project with James (*see id.* at 76:16-18, 77:20-22), there is no basis to conclude that James's responsibilities were limited to the activities that plaintiff observed. Indeed, Goldstein explained that James's position was "not at all similar" to plaintiff's position because "[t]hey performed differen[t] functions and were hired under a different hiring authority." (Mot., Ex. 12 (Goldstein EEO Aff., May 24, 2005) ("Goldstein Aff.") ¶ 13.)

*See Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) ("In order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination."); *accord Porter*, 601 F. Supp. 2d at 219.[10]  The Court will therefore grant summary judgment as to Count IV.

   **B.       Counts I and II: Termination**

   Plaintiff also alleges that the agency terminated his employment because of his race or gender.  (Compl. ¶¶ 39-54.)  In response, defendant explains that plaintiff was terminated because his performance as a probationary employee was unsatisfactory, based on his supervisors' "reasonabl[e] and sincere[] belie[f]" that he lacked the performance skills and interpersonal abilities necessary for the position.  (Mem. at 36.)  Given the evidence, the Court agrees with defendant's argument that plaintiff has not "produced evidence sufficient for a reasonable jury to find that [his] employer's stated reason [for terminating him] was not the actual reason and that the employer intentionally discriminated against [him] based on his race" or gender.  *Brady*, 520 F.3d at 495.

   With respect to plaintiff's performance skills, defendant asserts that plaintiff's supervisors perceived "that he often completed his work in an untimely fashion," "that he struggled to complete his work in a manner consistent with GAO guidelines," "that his written work was unorganized and failed to cite adequate support or background," and "that his oral presentation skills were deficient on at least one occasion . . . ."  (Mem. at 36.)  The facts underlying these perceptions are supported by the record.  For example, plaintiff admits that his

---

   [10] Any inference that Goldstein and Dorn's decision to hire plaintiff at the Band II level instead of the Band III level was motivated by racial animus is further undermined by the fact that Goldstein personally recruited plaintiff to join the agency.  *Cf. Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 13 (D.D.C. 2000) (noting that allegation of discriminatory termination was "undercut[]" by the fact that "the same individuals hired and terminated plaintiff"), *aff'd*, 298 F.3d 989, 996 (D.C. Cir. 2002).

work on the conceptual planning guide was criticized for his sentence structure, use of industry terminology, failure to link important concepts, and failure to comply with GAO indexing rules. (*See* Pl.'s SMF at 5 ¶¶ 24-25; Pl.'s Resps. To Def.'s 2nd Interrogs. at 4-5.)  Dorn also concluded that "[i]t simply took [plaintiff] too many iterations of the draft Guide and too long to produce a final draft that met GAO standards."  (Mot., Ex. 15 (Decl. of Terrell Dorn) ("Dorn Decl.") ¶ 3.) In addition, it is not disputed that when working on the Kennedy Center engagement, plaintiff missed the deadline for submitting the final draft of his section of the report; his initial draft lacked O&M cost estimates and its analyses were criticized as insufficiently substantiated; he prepared two more drafts which were also deemed inadequate; following plaintiff's oral presentation of his section of the report, Dorn concluded that plaintiff was overly formal, scripted, and unable to recover when interrupted; and Dorn also concluded that plaintiff's section of the report was poorly written, unsupported, based on flawed methodology, and lacking a basic understanding of the need to employ locality adjustments when estimating costs for high-cost areas.  (*See* Pl.'s SMF at 6 ¶¶ 31-35, 8-9 ¶¶ 39-44; Beyah Decl. ¶¶ 41-42 (noting Dorn and Edelstein's criticisms); Dorn DPM Notes at 1-2; Mot., Ex. 13 (Dorn EEO Aff., May 16, 2005) ("Dorn Aff.") ¶ 6; Fleming Aff. ¶ 7; Edelstein Aff. ¶¶ 4-6; Mot., Ex. 25 (Fleming Dep., Sept. 11, 2008) at 85-91.)

Plaintiff does not dispute the factual basis for many of these criticisms.  He argues instead that there were mitigating circumstances surrounding his failure to meet various deadlines and comply with GAO document guidelines.  Regarding the Guide engagement, he asserts that the project's focus changed in January 2004, with the purported effect of rendering "all" of his prior work "useless," and that he missed two other deadlines because he was required to prioritize his responsibilities on the Kennedy Center engagement.  (Beyah Decl. ¶¶ 21, 24; *see* Opp'n at 10-

11.)  He also asserts that although GAO gave him some training on how to index materials when he first joined the agency, "he never received more specific training from PI on how to index a document."  (Opp'n at 11.)  Similarly, regarding the Kennedy Center engagement, he attributes his inability to timely develop O&M cost estimates to the fact that Kennedy Center officials "did not produce this information," and he argues that the final draft of his section of the report was delayed because he had to seek clarification of his supervisors' sometimes contradictory comments.  (*See id.* at 12-17.)  These explanations do not assist plaintiff, because "plaintiff's perception of himself, and of his work performance, [are] not relevant."  *Smith v. Chamber of Commerce of the United States*, 645 F. Supp. 604, 608 (D.D.C. 1986).  "It is the perception of the decisionmaker which is relevant," *id.*, and plaintiff "cannot establish pretext simply based on [his] own subjective assessment of [his] own performance . . . ."  *Waterhouse*, 124 F. Supp. 2d at 7, *aff'd*, 298 F.3d at 995; *accord Talavera v. Fore*, No. 07-CV-720, 2009 WL 2731275, at *15 (D.D.C. Aug. 31, 2009) (Bates, J.).

Plaintiff does, however, challenge the factual basis for the criticisms of his written work. He has submitted a report by William Lawson, "an expert in the fields of buildings and real estate" (Opp'n at 2), which concludes that plaintiff's written work for the Guide and Kennedy Center engagements consisted of "well written drafts for their level of development," and that plaintiff properly employed BOMA standards when calculating O&M costs for the Kennedy Center engagement.  (Mot., Ex. 50 ("Lawson Report") at 1.)  Lawson's opinion about the quality of plaintiff's writing is not based upon expert knowledge or special familiarity with GAO practices and requirements.  In fact, Lawson never worked at GAO or previously evaluated the performance of a GAO Band II analyst.  (*See* Lawson Report at 13-14 (Lawson c.v.); Mot., Ex. 49 (Lawson Dep., Feb. 10, 2009) ("Lawson Dep.") at 58.).  Nor could Lawson say what

deadlines or oral feedback plaintiff was given, how many drafts he had written, or how many drafts would have been acceptable for GAO employees in plaintiff's situation.  (*See* Lawson Dep. at 40-41, 45-46, 49-50, 54.)  Defendant also notes that Lawson evaluated plaintiff's writing abilities based upon the incorrect premise that plaintiff was responsible for nearly all of the final draft of the Kennedy Center report (*see id.* at 82-84), when in fact, plaintiff was only responsible for one section.  (*See also* Mot., Ex. 22 (Decl. of Maria Edelstein) ¶ 8.)  Because Lawson's opinion about the quality of plaintiff's written work merely second-guesses the subjective judgments of plaintiff's supervisors, it cannot be relied upon to create any triable issues of fact. *See Sykes v. Napolitano*, 634 F. Supp. 2d 1, 7 (D.D.C. 2009) (striking report by plaintiff's expert in Title VII case where "[plaintiff's expert's] opinion is not 'expert'" but rather "merely the conclusion of a lay person who reviewed limited information on behalf of a person with an interest in the outcome"); *Nance v. Librarian of Congress*, 661 F. Supp. 794, 796 (D.D.C. 1987) (finding that plaintiff's expert in Title VII case had "no probative value" where he "had no experience" rating defendant agency's employees, was unfamiliar with actual responsibilities position in question, and "made inaccurate assumptions as to what qualities the job entailed").

Arguably, Lawson's conclusion that plaintiff's use of BOMA standards when estimating O&M costs "is considered a normal industry practice" (Lawson Report at 1) would be competent evidence.  But even this does not aid plaintiff.  First, the accuracy of plaintiff's Kennedy Center cost estimations were merely one factor among many that his supervisors considered when evaluating his performance.  Second, to the extent that plaintiff contends that he was criticized for his decision to use the BOMA standards (*see* Pl.'s SMF at 16 ¶ U), the evidence he relies upon shows that his supervisors did not object to the choice of BOMA standards *per se*.  As Edelstein explained, "[u]sing the BOMA information was not a concern.  [The concern] was . . .

applying the information correctly so it was applicable to the local area." (Opp'n, Attachment 32

(Edelstein Dep., July 15, 2008) at 69:10-13.)[11]  Plaintiff similarly explains in his declaration that

Dorn did not criticize him for using the BOMA standards but for supposedly failing to include a

locality adjustment when employing those standards.  (Beyah Decl. ¶¶ 37-39.)  While plaintiff

asserts that his original BOMA-based calculations did account for the locality adjustment (*id.* ¶¶

35, 38), Lawson stated that "reasonable people [can] disagree about whether the proper standard

was used," and that the choice of standard is ultimately a question of "professional judgment."

(Lawson Dep. at 36:5-9.)[12]

Given this record, it is not the Court's job to second-guess Dorn and Edelstein's decisions

to instruct plaintiff to include a locality adjustment.  (*See* Beyah Decl. ¶¶ 37-38.)  "Once the

employer has articulated a non-discriminatory explanation for its action, as did the [agency] here,

the issue is not 'the correctness or desirability of the reasons offered but whether the employer

honestly believes in the reasons it offers.'" *Fischbach v. Dist. of Columbia Dep't of Corr.*, 86

F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *McCoy v. WGN Continental Broad. Co.*, 957 F.2d

368, 373 (7th Cir. 1992) (brackets and ellipses omitted).  In other words, a district court judge

---

[11] The portions of Goldstein's deposition cited in plaintiff's statement of facts establish only that there were criticisms of plaintiff's "estimation of the O&M costs for the Kennedy Center engagement . . . ." (Opp'n, Attachment 34 (Goldstein Dep., Sept. 5, 2008), at 116:19-117:6.)  Similarly, the cited portions of Dorn's deposition show only that Dorn criticized plaintiff's perceived misuse of the "Means Cost Guide" standards, not the BOMA standards. (*See* Opp'n, Attachment 30 (Dorn Dep., July 17, 2008) at 152:20-153:1 ("The estimate that I was working with Omar on or had a problem with Omar on was based upon the Means Cost Guide, not on the BOMA Experience Exchange Report."); *accord* Dorn Aff. ¶ 6 ("[Plaintiff] was to provide cost estimates using the MEANS book [a reference book that all professionals in the construction field use].  He failed at this miserably . . . . He told me that he called someone who works for the MEANS Company and they told him that he did not have to consider some very basic factors.").)

[12] Lawson also stated that he did not know whether plaintiff's calculations had originally included a locality adjustment.  (Lawson Dep. at 62:18-22.)

does not sit as a "'super-personnel department that reexamines an entity's business decisions.'"
*Id.* at 1183 (quoting *Dale v Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986); *accord*
*Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008).

As for plaintiff's interpersonal problems, defendant asserts that plaintiff's supervisors
perceived that he was "at times confrontational in team meetings," "that he had problems
interacting in a professional and cordial manner with coworkers," and "that he was unsuccessful
in appropriately representing GAO to outside persons, including other agencies . . . ." (Mem. at
36.)  The record establishes that plaintiff's supervisors indeed concluded that he had difficulty
accepting constructive criticism or input from others and that he had negative or otherwise
inappropriate interactions with a number of other GAO teams and employees, including a GAO
librarian and John Brummet of the IAT team.  (*See* Goldstein Aff. ¶ 20; Dorn Decl. ¶¶ 5-6, 18;
Fleming Aff. ¶¶ 9-10, Edelstein Aff. ¶¶ 3, 8-10, 12; Brummet Aff. ¶ 4 (offering first-hand
opinion that plaintiff had been "abrasive"); *see also* Edelstein Aff. ¶¶ 5-6 (describing plaintiff's
inappropriate email tone and body language during meetings).)  Plaintiff's supervisors also
received complaints or concluded from personal observations that plaintiff had confrontational or
otherwise inappropriate interactions with officials from the State Department and Kennedy
Center.  (*See* Dorn Aff. ¶¶ 5, 14, 18; Dorn DPM Notes at 1; Fleming Aff. ¶ 6; Edelstein Aff. ¶ 5;
Brummet Aff. ¶ 3 (describing call from State Department contact who complained about
plaintiff).)

Again, plaintiff does not challenge the fact that he was involved in a dispute with the
librarian; that the State Department client complained about him; or that his supervisors on the
Guide and Kennedy Center engagements had concerns about his interpersonal abilities based on
incidents they observed or learned about.  Rather, he counters that the librarian dispute was not

his fault; that the employee who previously informed Dorn about the State Department's complaints later concluded that no further action was warranted; and that different GAO employees with whom plaintiff worked on other projects had positive views of or interactions with him.  (*See* Opp'n at 19-21.)  This does nothing to undermine defendant's contention that those who worked with and supervised plaintiff on the Guide and Kennedy Center projects – his two "most important assignments" (Opp'n at 2) – reasonably and sincerely believed that that his interpersonal abilities were a source of concern.  *See Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 59 (D.D.C. 2004) (finding that statements about quality of plaintiff's work by individuals "who did not supervise . . . or work closely enough" with her were insufficient to defeat summary judgment where plaintiff's supervisors held different view).

In sum, "[t]he critical issue here is not whether [plaintiff's] work . . . was actually deficient," but whether the agency's "decision-makers on personnel issues[] were of that opinion when they terminated [him].  There is no evidence that they were not."[13]  *Singh*, 300 F. Supp. 2d at 59.  (*See, e.g.*, Goldstein Aff. ¶ 20 ("I felt that after the training and time here at GAO, management, myself included, had not seen enough growth in his ability to think conceptually, to write, or to get his work accomplished.").)  The fact that Goldstein personally recruited plaintiff and that he and Dorn recommended plaintiff's hiring also seriously undercuts any

---

[13] In addition, the Court notes that "probationary employees may be terminated for problems even if those problems would not be good cause for terminating a permanent employee."  *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005).  The decision to terminate plaintiff was made while he was a probationary employee and would originally have been effective on September 10, 2004, shortly before the one-year anniversary of his effective GAO start date.  (*See* Hoskins Letter at 1.)

Although the PAB extended the termination's effective date to October 18, this was due to plaintiff's administrative appeal and not the decisions of his supervisors.  There is therefore no merit to plaintiff's argument that the agency improperly terminated him as a probationary employee instead of as a permanent employee.  (*See* Opp'n at 36.)

inference that their recommendation to terminate plaintiff, less than one year later, was motivated by discriminatory animus.  *See Waterhouse*, 298 F.3d at 996 (finding that probative value of allegedly discriminatory statements by supervisor "was seriously undercut by the undisputed fact that [the supervisor] approved the decision to hire [the plaintiff] earlier that same year," and citing supportive cases from other circuits).  "Moreover, [Goldstein and Dorn were] not the only one[s] to complain of [plaintiff's] deficiencies," *id.*, as plaintiff's performance on projects besides the Guide and Kennedy Center was also criticized.  (*See, e.g.*, Goldstein Aff. ¶ 22 (citing criticism by Band III Assistant Director Kathleen Turner); Gryszkowiec Meeting Notes at 1, 3-4 (citing timeliness or other criticisms on projects involving "electronic waste," D.C. jail, and USDA's Natural Resources and Environment mission area).)

"Because [plaintiff] did not contravene – and in fact admitted – many of the deficiencies the defendants cited concerning [his] performance, [he] failed to establish that [his] employer's proffered explanation was unworthy of credence.  At best, [his] responses constitute[] an argument that, notwithstanding those failings, the [agency] should not have terminated [him] because there were extenuating circumstances and there were some positive attributes to [his] performance.  But courts are without authority to second-guess an employer's personnel decision absent demonstrably discriminatory motive.  And [plaintiff's] responses offer[] no grounds for a rational juror to conclude that the reason [he] was fired was racial [or gender-based] discrimination rather than poor performance."[14]  *Waterhouse*, 298 F.3d at 995 (internal quotation

---

[14] Plaintiff's argument that discrimination should be inferred from his "replacement" by a female analyst, Maureen Luna-Long, is unpersuasive because she was not similarly situated. (*See* Opp'n at 25.)  "Employees are 'similarly situated' when 'all of the relevant aspects' of their employment situations are 'nearly identical.'"  *McFadden v. Ballard, Spahr, Andrews & Ingersoll, LLP*, 580 F. Supp. 2d 99, 109 (D.D.C. 2008) (quoting *Neuren v. Adduci, Mastriani, Meeks, & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995)).  It is undisputed that the PI team had different subgroups including a facilities group, in which plaintiff worked, and a transportation

marks, brackets, and citations omitted).   Accordingly, the Court shall grant summary judgment on Counts I, II, and IV.

## IV.    RETALIATION

"To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim."   *Baloch*, 550 F.3d at 1198.   Plaintiff contends that he was terminated because he documented his April 7, 2004 meetings with Fleming and Edelstein, during which they set performance expectations for him.   (Opp'n at 23.)   He argues that this was protected "opposition" to discrimination[15] because he separately informed Fleming "that he documented their discussions because he believed that his race and sex motivated the setting of the expectations," and later informed Dorn and Goldstein that he submitted the memorializing document to Fleming.[16]   (*Id.*)   Because the Court has already concluded that plaintiff has not produced evidence that would cast doubt upon defendant's proffered reason for terminating him,

---

group.   (*See* Beyah Dep. at 131:23-132:2.)   Luna-Long was hired by different GAO officials to fill a *transportation* specialist's position that arose two months *before* plaintiff's termination had been proposed.   (*See* Reply at 15-16; *id.*, Ex. F-H (vacancy announcements and Luna-Long application).)   The most relevant aspect of Luna-Long's employment – namely, the position she was hired to fill – is therefore not "nearly identical" to plaintiff's position.

[15] The Court notes that plaintiff cannot base his retaliation claim on a theory that he "participated" in statutorily protected activity.   First, his statement that he "participated in protected activity" by "inform[ing] his supervisors that he was documenting their discriminatory behavior" (Opp'n at 4) does not fall under the statutory definition of participating in an EEO "investigation, proceeding, or hearing."   42 U.S.C. § 2000e-3(a).   Second, he failed to oppose defendant's argument that his retaliation claim cannot be based upon EEO participation because he only contacted an EEO counselor *after* he learned that his supervisors recommended his termination.   (*See* Mem. at 40.)   Plaintiff has thus conceded any argument based on Title VII's "participation clause."   *See Franklin v. Potter*, 600 F. Supp. 2d 38, 60 (D.D.C. 2009) (citing authorities and treating defendant's argument in motion for summary judgment as conceded where plaintiff failed to address it in his opposition).

[16] The April 7 meeting memoranda did not reference race or gender.   (*See generally* Mot., Exs. 53 & 54.)

the Court grants summary judgment on his retaliation claim.[17]

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion.  A separate Order will accompany this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date:  October 26, 2009

---

[17] In the alternative, the Court agrees with defendant that plaintiff's actions did not constitute "opposition" to discrimination on the basis of race or gender.  Title VII provides that it is unlawful to retaliate against an employee "because he has opposed any practice made *an unlawful employment practice* by this subchapter . . . ."  42 U.S.C. § 2000e-3(a) (emphasis added).  "To come within the opposition clause of Section 2000e-3(a), one must demonstrate an objectively reasonable belief that the practice 'opposed' actually violated Title VII; otherwise, the activity . . . was not statutorily protected activity."  *Burton v. Batista*, 339 F. Supp. 2d 97, 114 (D.D.C. 2004).  Section 2000e-2(a) defines unlawful practices as (1) discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," or (2) classification of an employee that would "adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."  *Id.* § 2000e-2(a)(1).

Plaintiff has not demonstrated that he had an objectively reasonable belief that merely setting expectations for a probationary employee's performance can constitute discrimination in the terms and conditions of employment or an adverse effect upon employment status.  *See also Taylor v. Small,* 350 F.3d 1286, 1293 (D.C. Cir. 2003) ("An 'adverse employment action' within the meaning of *McDonnell Douglas* is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Nor would it be objectively reasonable to hold such a belief.  "An employer should be entitled to discuss and even critique employees about legitimate job performance problems without being subjected to suit, because Title VII's anti-retaliation provision was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work."  *Rattigan v. Holder*, 604 F. Supp. 2d 33, 49 (D.D.C. 2009) (internal quotation marks and citations omitted).